# United States Court of Appeals
## For the First Circuit

No. 22-1674

JACK OWENS, JEFFREY DREES, KATELYN MURPHY, PATRICK MONOLIAN,
SCOTT MANN, SEAN HUSSEY, on behalf of themselves and all others
similarly situated, JOHN AMIRAULT, PATRICIA BAILEY, RICHARD
BARTHELMES, STEPHEN BELLAVIA, STEPHEN C. BELLAVIA, AYRTON
BORGES, DANIEL BOURQUE, NOELLE BOWIE-PIERCE, TYLER CALHOUN,
CAROLE CARLIN, SCOTT CARROLL, MICHAEL CASALETTO, JAMES CASELLA,
DANNY CATANA, KATELYN F. MURPHY CENTORE, ALISON CHARPENTIER,
ANDY CHEN, EDMUND CHOI, ROBERT CLEMENTE, CONOR CLOHERTY, KEVIN
CO, DAVID CONNELLY, RICHARD CORREALE, NICHOLAS COX, JON
CRANNELL, SANDROFF DADAILLE, JOHN DELANEY, CORY D'ENTREMONT,
CAMERON DICARLO, SHAWN DILLON, ROBERT DISALVATORE, RICHARD
DOHERTY, RUSSELL DONOVAN, KEVIN FERRICK, BLAKE FERRY, EDWARD
FITZPATRICK, STEVEN FITZPATRICK, RYAN FORTIER, DAVID FRANZESE,
JASON FROIO, MARC GATCOMB, SALVATORE GENNETTI, MICHAEL GIORDANO,
EVER GOMEZ, AMANDA GRENIER, CHRIS GRIFFITHS, PHILIP HALLORAN,
JUNE F. MCADAM HASSENFRATZ, TRENT HEADLEY, MAUREEN HOLLAND, PAUL
HOPKINS, ERIK ISRAELSON, JOSEPH KEEFE, JOHN KELLEY, KEVIN
KILLION, PATRICK KINNON, GUSTAVO KRUSCHEWSKY, JEAN LAMOUR,
MICHAEL LANGSTON, JOHN LANNI, KEVIN LAW, GEORGE LOPEZ, STEVEN
LUBINGER, MICHAEL LUONGO, MARGARET MACDONALD, GEORGE MACKAY,
ADAM MAHER, JOSEPH MARTINEZ, RENEE KELLEY-NUSUM, LAWRENCE
MCGAHEY, KEVIN MCKENNA, PAUL MCLEOD, ELIJAH MCNEAL, JOHN
MEDEIROS, PETER MITCHELL, MICHELET MONTINA, JESUS MONTOYA,
STEVEN MULCAHY, STEPHEN MUNYON, BRIAN NEWNAN, STEPHEN NOBLE,
ROBERT O'BRIEN, SALVATORE PACI, MICHAEL POLSTON, MICHAEL POWELL,
MATTHEW QUINN, JOSHUA REDMOND, JOHN REYNOLDS, WILLIAM ROWE,
KEVIN RUSSELL, CAMERON SELFRIDGE, ROBERT SELFRIDGE, KYLE SHAW,
KEVIN SHERIDAN, ADAM SIEGEL, DANIEL SYLVA, BRIAN TILLEY, EVAN
TUXBURY, ROBERT WADLAND, JOSEPH WALKER, CHARLES WASHINGTON,
KENNETH WATKINS, KEITH WILSON, AMANDA F. SELFRIDGE YANOVITCH,
DAVID YUNG,

Plaintiffs, Appellees,

v.

CITY OF MALDEN,

Defendant, Appellant.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

————————————

Before

Montecalvo, Selya, and Thompson,
Circuit Judges.

————————————

Barry J. Miller, with whom Alison Silveira, Timothy Buckley,
and Seyfarth Shaw LLP were on brief, for appellant.
Joseph A. Padolsky, with whom Louison, Costello, Condon &
Pfaff, LLP was on brief, for appellees.

————————————

October 30, 2023

————————————

**MONTECALVO, <u>Circuit Judge</u>**. This appeal follows a bench trial involving police officers in the City of Malden (collectively, "Officers") and the City of Malden (the "City"). The Officers brought suit against the City for allegedly deducting a ten percent administrative fee from wages they received for police detail work. At the heart of the lawsuit was a term in the Collective Bargaining Agreement ("CBA") that set the hourly rate for police detail work -- a term that the parties interpreted differently. The Officers presented their interpretation of the term, which aligned with how the Officers were historically paid. The contract term was crucial to the case because the Officers claimed that a ten percent deduction for an administrative fee resulted in a reduction in their wages -- as set forth in the CBA -- thereby violating the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148 (the "Wage Act"). The City, however, argued that the CBA set a lower rate than the Officers were paid, so any reduction in the calculated rate still resulted in a higher payout than contemplated in the CBA.

At trial, the district court concluded that the contract term was ambiguous and extrinsic evidence was required to clarify the CBA. Then, after considering witness testimony, the court held that the Officers' interpretation was correct and the City had violated the Wage Act. Further, the court ruled that, even if the City had overpaid the Officers, the City had violated

Massachusetts General Laws chapter 44, § 53C (the "Municipal Finance Law") by deducting an administrative fee from the Officers' wages, thus still violating the Wage Act.

After review, we conclude that the contract term was unambiguous in favor of the City and that there was no violation of the Wage Act or Municipal Finance Law.  Accordingly, we <u>reverse</u>.

## I.  Background

The City is a municipality located in Middlesex County, Massachusetts that employs the Officers through the City of Malden Police Department.  During their off-duty hours, Officers may volunteer to provide additional public service or public safety services ("Detail") in return for additional compensation.  These Detail services may be requested by a City department ("Public Detail") or by a private third party through an agreement between the City and the third party ("Private Detail").  For Private Detail, the Municipal Finance Law permits the City to charge an additional ten percent administrative fee to the private third parties.  At issue here is the parties' calculation of the Officers' compensation for Private Detail, pursuant to the CBA's Detail compensation term.

The organization of the Detail process is "under the exclusive direction and control of the [D]etail [B]oard." <u>Owens</u> v. <u>City of Malden</u>, 568 F. Supp. 3d 77, 86-87 (D. Mass. 2021).  This Detail Board is made up entirely of "representatives and members

- 4 -

of the [Officers'] Unions."  Id.  This "[D]etail [B]oard . . .
ha[s] control over all matters having to do with [D]etails."  As
part of this exclusive direction and control, the Detail Board
calculates the Detail compensation rate without input from the
City.  The CBA, negotiated between the City and the Officers'
unions, dictates that compensation for these Details shall be "one
and one half times the maximum patrolman's rate of pay including
night differential."  For context, in Article 30, the CBA describes
all the factors that contribute to an officer's maximum
compensation.  Within that Article, the CBA explains that an
officer shall receive a base salary but may also be entitled to
various wage augments.  The relevant augments for this appeal are:
(1) a six percent night shift differential; (2) hazardous duty
pay, which is a set annual sum that is paid out weekly; (3)
longevity pay, which is a benefit earned based on years worked;
and (4) educational incentives (also called "Quinn Bill
Benefits"), which provide additional pay for an officer's earned
educational degrees.

Based on its interpretation of the CBA, the Detail Board
calculated "the maximum patrolman's rate of pay including night
differential" to include a patrolman's maximum base salary plus
the night differential as well as hazardous duty pay, longevity
pay, and educational incentives (the "Officers' Rate").  To account
for the administrative fee associated with Private Details, the

Detail Board would then reduce its calculation by ten percent and set that number as the Detail rate of compensation.  Then, when the City would invoice third parties, ten percent would be added on top of that rate to collect the administrative fee for the City.

A few days before filing this lawsuit, the Officers' unions began investigating whether the application of the administrative fee for Private Details reduced the Officers' wages.  After the investigation, without first filing a complaint with the Massachusetts Attorney General, the Officers filed suit alleging that a ten percent reduction of the Private Detail rate violated the Wage Act.[1]  In response, the City argued that the CBA's Detail term only entitled the Officers to the maximum base pay plus a night shift differential (the "City's Rate").  As such, the City maintained that the Officers were overpaid, and that an administrative fee deduction -- to the extent there was one -- did not reduce the Officers' contractually defined wages.  A bench trial followed.

At trial, the court heard testimony from various witnesses regarding the operation of the Detail process and the meaning of the Detail compensation contract term.  At the trial's conclusion, the court issued a Memorandum of Decision and found that the City had violated the Wage Act.  Owens, 568 F. Supp. 3d

---

[1] The Officers also alleged a violation of the Fair Labor Standards Act but did not appeal the court's ruling on the issue.

at 100-01.  In doing so, the court held: (1) that the Officers did not need to file with the Massachusetts Attorney General before initiating suit, (2) that the contract term was ambiguous and entitled the Officers to the Officers' Rate, and (3) that the City had improperly deducted the administrative fee from the Officers' wages.  Id. at 89-91, 97-99.

This appeal followed.

## II.   Standard of Review

When a district court conducts a bench trial, we review its legal determinations de novo.  United States v. 15 Bosworth St., 236 F.3d 50, 53 (1st Cir. 2001).  The court's factual findings, however, are "entitled to considerable deference."  Id. But "an appellate court will displace factual findings made in the aftermath of a bench trial if those findings are clearly erroneous."  Id.  And "when a trial court bases its findings of fact on an inaccurate appraisal of controlling legal principles, the rationale for deference evaporates entirely."  Id. at 54.

## III.   Discussion

The City first argues that the Officers failed to file a pre-suit complaint with the Massachusetts Attorney General, which should have barred this lawsuit from proceeding.  Next, the City argues that the Detail contract term is unambiguous and entitles the Officers to the City's Rate only.  As such, the City

- 7 -

maintains that the Officers were overpaid, which would nullify any Wage Act claim.  We take each argument in turn.

### A. Pre-Suit Requirement

The City contends that the district court erred when it allowed the Officers to proceed with their Wage Act claim despite their failure to file a pre-suit claim with the Massachusetts Attorney General.  The relevant law provides that:

> An employee claiming to be aggrieved by a violation of [the Wage Act] . . . may, 90 days after the filing of a complaint with the attorney general, or sooner if the attorney general assents in writing, and within 3 years after the violation, institute and prosecute in his own name and on his own behalf, or for himself and for others similarly situated, a civil action for injunctive relief, for any damages incurred, and for any lost wages and other benefits. . . .

Mass. Gen. Laws ch. 149, § 150.  In considering this issue, "we must apply the state's law on substantive issues and 'we are bound by the teachings of the state's highest court.'"  Phoung Luc v. Wyndham Mgmt. Corp., 496 F.3d 85, 88 (1st Cir. 2007) (quoting N. Am. Specialty Ins. Co. v. Lapalme, 258 F.3d 35, 37–38 (1st Cir. 2001)).

We see no error in the district court's decision to allow this litigation to proceed.  In Depianti v. Jan-Pro Franchising Int'l, Inc., 990 N.E.2d 1054, 1062 (Mass. 2013), the Massachusetts Supreme Judicial Court ("SJC") determined that a failure to file a Wage Act complaint with the Attorney General before filing a

private suit did not deprive a court of jurisdiction to hear the claim.  In so holding, the SJC considered "(1) to what extent the defect interferes with the 'accomplishment of the purposes implicit in the statutory scheme,' and (2) to what extent the opposing party can 'justifiably claim prejudice.'"  Id. at 1060 (quoting Schulte v. Dir. of the Div. of Emp. Sec., 337 N.E.2d 677, 680 (Mass. 1975)).  The SJC determined that "[t]he requirement that a plaintiff file a complaint with the Attorney General before bringing a private suit is intended simply to ensure that the Attorney General receives notice of the alleged violations, so that she may investigate and prosecute such violations at her discretion."  Id. at 1061.  Put simply, the pre-suit filing requirement is meant to "ensure[] that private actions for wage violations do not come and go without the Attorney General ever being made aware of the alleged unlawful conduct."  Id.  Thus, a "failure to file a complaint with the Attorney General before initiating a private suit for alleged employment violations does not interfere with the accomplishment of the statutory purposes of § 150 to a substantial degree, at least where the Attorney General is notified of the suit during its pendency."  Id. at 1062.

Here, despite being severely delayed, the Officers filed a complaint with the Attorney General before the district court entered its final judgment.  As such, the Attorney General was notified of the suit during its pendency.  Cf. Herbert A. Sullivan,

Inc. v. Utica Mut. Ins. Co., 788 N.E.2d 522, 535 (Mass. 2003)
("[T]he power to reconsider a case, an issue, or a question of
fact or law, once decided, remains vested in the court until a
final judgment or decree is entered. . . ."); Boyce v. Wheeler,
133 Mass. 554, 554 (1882) (noting that the "rule of law is well
settled that, in cases pending in the Superior Court, questions of
law arising therein cannot be entered and heard in this court,
upon appeal or exceptions, until after final judgment in the
Superior Court").    Shortly thereafter, the Attorney General's
office responded and informed the Officers that they were
"authorizing [the Officers] to pursue this matter through a private
civil lawsuit."    Based on Depianti and the Attorney General's
letter, we conclude that the purposes implicit in the statutory
scheme have been satisfied.    And

> a defendant cannot plausibly claim prejudice
> by the tardiness of the plaintiff's filing, at
> least where, as here, the plaintiff's suit
> would not have been time barred under the
> three-year limitations period included in G.L.
> c[h]. 149, § 150, had he first filed with the
> Attorney General and waited ninety days before
> bringing suit against the defendant.

Depianti, 990 N.E.2d at 1062.    Hence, the district court was
correct to allow this litigation to continue.

## B. Ambiguity of the Contract Term

The City next argues that the contract term governing
Detail compensation is unambiguous and entitles the Officers to

less than they were actually paid. Determining "[w]hether a term is ambiguous is a question of law." Lanier Pro. Servs., Inc. v. Ricci, 192 F.3d 1, 4 (1st Cir. 1999). "To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 783 (1st Cir. 2011) (quoting Bank v. Thermo Elemental Inc., 888 N.E.2d 897, 907 (Mass. 2008)). Under Massachusetts law, a contract term is ambiguous if its language is "reasonably prone to different interpretations" or "susceptible to differing, but nonetheless plausible, constructions." Alison H. v. Byard, 163 F.3d 2, 6 (1st Cir. 1998). But "[a]mbiguity is not created merely because the litigants disagree about the meaning of a contract." Nicolaci v. Anapol, 387 F.3d 21, 26 (1st Cir. 2004).

Here, the CBA dictates that Detail compensation is set at "one and one half times the maximum patrolman's rate of pay including night differential." The City maintains that this term includes the highest patrolman's base salary plus a night differential wage augment of six percent. Under the Officers' interpretation, this term includes the highest base salary and a night differential wage augment, as well as any educational incentives, longevity pay, and hazardous duty pay.

The contract term here is unambiguous in favor of the City.  We conclude as much by relying on "the familiar principle of expressio unius est exclusio alterius, . . . [which] 'instructs that, when parties list specific items in a document, any item not so listed is typically thought to be excluded.'"  Riley v. Metro. Life Ins. Co., 744 F.3d 241, 249 (1st Cir. 2014) (quoting Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995)).  But "the canon expressio unius est exclusio alterius does not apply to every statutory listing or grouping; it has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence."  Barnhart v. Peabody Coal Co., 537 U.S. 149, 168 (2003) (quoting United States v. Vonn, 535 U.S. 55, 65 (2002)).

Such is the case here.  The various wage augments in the Officers' Rate are all defined in Article 30 of the CBA, establishing that they are members of an associated group.  There is some force to the fact that the CBA defines wage augments -- except for longevity pay and educational incentives, which are sensibly grouped because of their mutual exclusivity -- in separate sections.  Scrutinizing these definitions reveals that the night differential is the only wage augment that is shift specific.  The other wage augments increase an officer's base salary or are paid

out in a lump sum.  Yet, other language in the CBA casts considerable doubt on this interpretation.

In other sections of the CBA, wage augments are explicitly listed when they are applicable to a given rate.  For example, in Article 16, § 4, the CBA establishes that an officer's Overtime rate "shall be 1/40th of the officer's weekly pay to include base pay, hazardous duty pay, night differential, longevity and educational incentive monies to which the officer is entitled, multiplied by one and one-half for number of hours worked."  The City argues that the inclusion of wage augments in the Overtime rate supports the application of the _expressio unius_ canon.  But this argument ignores the specific language describing the Overtime rate.  The Overtime rate is defined as an "officer's weekly pay," which includes "base pay" and various wage augments. The specific use of the term "base pay" thus might imply that the disputed term "patrolman's rate of pay" cannot mean base pay. Otherwise, as the City's position would require, two terms would describe the same amount without any explanation for the variance. But a simple explanation for this variance, as the City suggests, is imprecise drafting.  We cannot discount this explanation, given the drawn-out nature of negotiating the CBA.  Even so, while we recognize that this example remains consistent with the City's position, its distinct language renders it a less persuasive

predicate for the <u>expressio unius</u> canon.  We therefore must look to other sections of the CBA for greater guidance.

In Article 14, § 1, the CBA explains that an officer who goes to court as a witness ("Court Time") shall be paid at a rate of "one and one-half (1 1/2) times the maximum patrol officer's rate of pay including night differential," nearly identical language to the Detail compensation term.  Then, in Article 16, § 3, the CBA specifies that "[a]ll officers earning so-called 'Quinn Bill Benefits' . . . shall have such benefit included and calculated for [C]ourt [T]ime."  As Article 16, § 3, demonstrates, the CBA is clear as to when a wage augment is to be included in an officers' compensation rate.  To do so, the drafters of the CBA took care to write another provision in order to explicitly fold Quinn Bill educational incentives into Court Time.  And as we see, the Detail term is essentially identical to the Court Time term; both rates are one and one-half times the maximum patrolman's (or patrol officer's) rate of pay including night differential. Despite this identical construction, under the Officers' interpretation of the Detail rate, Quinn Bill educational incentives are included in the contract term even without a corresponding provision explicitly including them.  Such an interpretation would render Article 16, § 3, meaningless -- an unacceptable outcome.  <u>F.D.I.C.</u> v. <u>Singh</u>, 977 F.2d 18, 22 (1st Cir. 1992) (explaining that an argument calling for the court to

adopt "a construction that would render an express clause in the documents nugatory. . . . flies in the teeth of Massachusetts law, which directs courts to give reasonable effect to each provision of an agreement wherever feasible"). Consider, further, a situation in which the highest paid patrolman does not receive educational incentives. A patrolman who is entitled to educational incentives would receive Court Time pay based on the wages of a patrolman who does not receive these incentives, even though the CBA dictates that the patrolman receiving them "shall have such [incentives] included and calculated for [C]ourt [T]ime." (Emphasis supplied). This command to include educational incentives seemingly becomes meaningless. That resulting conflict provides additional support for the application of the expressio unius canon.

In fact, the Officers' Rate would also require us to read Article 30, § 8, contrary to the plain text. Article 30, § 8, explicitly states that "[a]n officer cannot receive both longevity and education pay." The text is abundantly clear: there are no circumstances in which an officer may receive both longevity pay and educational incentives. Yet, the Officers' Rate does exactly that and gives officers both longevity and education pay -- an outcome that the CBA forbids. Looking back to the Overtime rate, we see that the CBA avoided this outcome by stating that an officer would receive "longevity and educational incentive monies

to which the officer is entitled," which contemplates that an officer could be entitled to one or the other, but not both. There is no such language here, and the Officers' Rate would give an officer money to which they are not -- and cannot be -- entitled.

Standing alone, perhaps the contract term would conjure up enough ambiguity to necessitate a turn to extrinsic evidence, but "[a]ccepted canons of construction forbid the balkanization of contracts for interpretive purposes." Smart, 70 F.3d at 179; see also Bukuras v. Mueller Grp., LLC, 592 F.3d 255, 262 (1st Cir. 2010) (explaining that "the parties' intent must be gathered from a fair construction of the contract as a whole and not by special emphasis upon any one part" (cleaned up)). When reading the contract as a whole, it becomes clear that the Detail rate does not include any wage augments beyond the night differential. The term "maximum patrolman's rate of pay including night differential" entitles an officer to the highest base salary for a patrolman plus the night differential wage augment and nothing more. Thus, we conclude that the district court erred when it determined that the contract term was ambiguous.[2]

---

[2] We note that before considering any extrinsic evidence, the district court apparently agreed that the contract language was unambiguous in favor of the City. The district court explained that despite the "unambiguous and not-difficult calculation approach . . . the parties actually did something different and they did it over a significant period of time." This language suggests that the district court read the contract term to only include base salary plus the night differential, which was contrary

## C. **Wage Act Violation and Municipal Finance Law Violation**

Having concluded that the proper Detail rate is the highest base salary for a patrolman plus the night differential, we must still address whether the Officers were paid what they were required under the CBA. In relevant part, the Wage Act provides that:

> Every person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week, or to within seven days of the termination of the pay period during which the wages were earned if such employee is employed seven days in a calendar week. . . .

Mass. Gen. Laws ch. 149, § 148.

Our review of the record confirms that even after a ten percent deduction from the Officers' Rate, the Officers were nonetheless paid more for Private Details than the CBA required. As a representative example, from July 2019 to July 2020, the highest base salary for a patrolman was $30.30 an hour or $1,212.10 for forty hours of work. Adding a six percent night differential

---

to how the contact term was applied in reality. The court went on to "wonder if [the CBA] c[ould] be altered by . . . joint conduct of the parties over a period of time?" The district court then considered extrinsic evidence and changed its mind on the ambiguity of the term, which was improper. See ITT Corp. v. LTX Corp., 926 F.2d 1258, 1261 (1st Cir. 1991) ("Under Massachusetts law, parol evidence may not be admitted to contradict the clear terms of an agreement, or to create ambiguity where none otherwise exists.").

($72.73) to that amount results in a total of $1,284.83. Dividing that total amount by forty hours results in $32.12 per hour, which is then multiplied by 1.5 for a proper City's Rate of $48.18 per hour. After the Detail Board's calculations and a corresponding deduction for the administrative fee, the Officers were paid $59.92 per hour for Details. The math demonstrates that the Officers were paid $11.74 more per hour than the CBA required. As such, there is no Wage Act violation for an improper reduction of wages.[3]

Finally, we must address the district court's holding that, even if the Officers were overpaid, a violation of the Municipal Finance Law creates a de facto Wage Act violation. The Municipal Finance Law dictates that a city "may establish a fee not to exceed ten per cent of the cost of services authorized under this section, which shall, except in the case of a city, town, district or the commonwealth, be paid by the persons requesting such private detail." Mass. Gen. Laws ch. 44, § 53C. The district court, when confronted with the City's overpay argument, stated that:

> Irrespective of how high a detail rate may have been under individual circumstances, the City violated [the Municipal Finance Law] when it deducted a ten percent administrative fee from the Officers' wages for private detail

---

[3] Because we conclude that the Officers were paid more than the proper wage, we do not address the City's alternative arguments that, for purposes of the Wage Act, (1) the City did not "employ" the officers working Private Details and (2) compensation for Private Details do not constitute wages.

> work, instead of charging the third party that
> had requested the private detail. Under these
> circumstances, the Officers might have been
> paid a high detail rate in some situations,
> but they still were not paid what they were
> owed in accordance with [the] Massachusetts
> [Wage Act].

Owens, 568 F. Supp. 3d at 100-01. In short, the district court

held that the City -- through the administrative fee deduction

calculated by the Detail Board -- had charged the administrative

fee to the Officers rather than to the private third parties. Id.

at 101. In the court's view, this Municipal Finance Law violation

created a Wage Act violation. Id.

       The court's holding that the City violated the Municipal

Finance Law was clearly erroneous. As we see from the July 2019

to July 2020 period, the Detail rate paid to the Officers was

$59.92 per hour. Public Details are not subject to any

administrative fee, so if the City truly did charge the

administrative fee to the Officers, we should see that the Officers

were paid less for Private Details than for Public Details. But

it is undisputed that a $59.92 rate was paid to Officers,

regardless of whether they participated in Public or Private

Details. Further, in the case of Private Details, it is plain

that the City added the ten percent administrative fee on top of

the $59.92 before invoicing private parties. We can confirm this

through a calculation: $59.92 + ($59.92 x .10) = $65.91.

Simplified, we see that the City took the rate provided by the

Detail Board ($59.92), multiplied that rate by ten percent ($5.99), and then added those two numbers together ($65.91) to calculate the private rate.  As we see in the published rate memo for this time period, $65.91 was presented to third parties as the Private Detail rate including a ten percent administrative fee.  So, as evidenced by the Officers being paid the same across all Details, the City did not charge the Officers the administrative fee.  The Officers argue that the proper rate was $65.91 and that the administrative fee should have been added on top of that number to conform with the Municipal Finance Law, but we have already resolved the issue of the proper rate.[4]  In conclusion, even if we assume without deciding that a Municipal Finance Law violation can create a de facto Wage Act violation, the district court clearly erred in finding that the City had violated the Municipal Finance Law.

## IV.  Conclusion

For the foregoing reasons, we <u>reverse</u> the district court's judgment and <u>remand</u> for proceedings consistent with this opinion.  Costs shall be taxed in favor of the City.

---

[4] Separately, we note that if, as the Officers contend, the proper Detail rate was $65.91 and the City had reduced that rate by ten percent, we would see a rate of $59.32 -- $65.91 x .90 -- and not $59.92.  We also point out, once more, that the Detail Board -- comprised of police officers and police officer union members -- calculated the ten percent deduction itself.